**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JUSTIN WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-1842 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| COOK COUNTY, and MORRISON | ) | |
| HEALTHCARE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is about a soldier named Washington. Justin Washington served his country in the Army Reserves for more than a decade. He also worked for Cook County, in the food service part of Stroger Hospital. He's a fighter and a feeder.

He took leave to go on active military service several times during his employment with Cook County, most recently from 2018 to 2021. But in 2021, he retired from the military for medical reasons due to complications from a heart procedure gone wrong.

After his final military leave, Washington returned to employment with Cook County. But his return didn't go smoothly. Now, he thinks that Cook County violated federal and state statutes that protect the rights of veterans to return to work. So, he sued Cook County.

Washington claims that Cook County didn't try to employ him in the position that he deserved under the statutes. He also claims that Cook County failed to accommodate his worsening condition from his botched heart procedure, and retaliated against him for his military service and for previously exercising his rights under the statute.

After discovery, Cook County moved for summary judgment.

For the following reasons, the Court grants in part, and denies in part, Cook County's motion for summary judgment.

## Background

### I. Washington's Job History

In the early 2000s, Washington worked for Morrison Senior Dining as a Director of Food Services at Provident Hospital. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 42). Then in 2006, he started working for Cook County as a Dietitian IV at pay grade 20 at Stroger Hospital. *Id.* at ¶¶ 4, 10; Pl. Dep. Tr. Day 1, at 49:21-23 (Dckt. No. 39-3). At that time, he was also in the Army Reserves. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 10–11 (Dckt. No. 42); *see also* Pl. Dep. Tr. Day 1, at 48:24 – 49:20.

Washington's role was essential to the functioning of his department at Stroger Hospital. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 42). His job responsibilities revolved around making sure the hospital patients were fed. For example, he developed the menu and managed subordinate supervisors, cooks, and food service workers. *See* Pl. Dep. Tr. Day 1, at 46:6-14 (Dckt. No. 39-3). In that vein, he also played a role in training, scheduling, and discipline. *Id.* at 46:15-17.

Washington reported to the Director of Food and Nutrition Services, who oversaw the food and nutrition department: patient services, clinical services, the kitchen, and the cafeteria. *Id.* at 182:4-8; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 42). The Director of Food and Nutrition Services, in turn, reported to the Executive Director of Operations and Support Services. *See* Def.'s Ex. 4, Weber Dep. Tr., at 27:20 – 28:6 (Dckt. No. 39-7).

Two other facts are worth mentioning. Starting in 2012, Washington was required to clock in and clock out. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 42). And

2

while Washington was a Dietitian IV, there was no Dietitian V position at Stroger Hospital.  *Id.*
at ¶ 6; *see also* Collective Bargaining Agreement, at 50 (Dckt. No. 12-2); Pl. Dep. Tr. Day 2, at
54:9 – 56:21 (Dckt. No. 39-5).  He was at the top of that food chain, so to speak.

## II.     Washington's Military Leaves

Washington took military leave several times during his employment with Cook County.
He submitted at least eight military orders for military leave over the course of ten years.  *See*
Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 42).  Cook County approved his leave
every time.  *Id.*; *see also* Pl. Dep. Tr. Day 1, at 71:13-17 (Dckt. No. 39-3).

### A.     Washington's 2011 Military Leave and First Lawsuit

Washington went on military leave from February 2011 to February 2012.  *See* Def.'s Ex.
5, at 3 (Dckt. No. 39-8).  After his return, in 2013, he filed a lawsuit (similar to this one) in
federal court against Cook County.  *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 12
(Dckt. No. 42).

In a nutshell, Washington alleged that Cook County failed to pay him his full due, failed
to give him his full sick and vacation time benefits, failed to reemploy him in the proper position,
and subjected him to a hostile work environment.  *Id.* at 3–5.  Some of those claims were brought
under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38
U.S.C. § 4301 *et seq.  Id.*

That case settled in 2017.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 13 (Dckt. No.
42).  As a result of the settlement, Washington's position as Dietitian IV became a union position
under a collective-bargaining agreement between the Service Employees International Union
Local 73 and Cook County.  *Id.* at ¶ 14.  Although he stayed at pay grade 20, his pay increased

because he went from the pay scale for non-union employees to the pay scale for union employees. *Id.*; *see also* Pl. Dep. Tr. Day 1, at 81:8-19 (Dckt. No. 39-3).

Changing Washington's position to a union position may have altered another aspect of his job – whether he was allowed to discipline subordinates. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 16 (Dckt. No. 42). But the record isn't completely clear. Washington's original job responsibilities included training and disciplining subordinates. *See* Pl. Dep. Tr. Day 1, at 46:9-17 (Dckt. No. 39-3). At times, Washington has said that joining the union did not change his job description. *Id.* at 83:15-20. But he also has said that joining the union meant that he was eventually no longer allowed to take disciplinary action. *Id.* at 83:23 – 84:2.

### B. Washington's 2018 Military Leave and 2021 Sick Leave

Washington's most recent military leave was from August 3, 2018 to September 29, 2021. *Id.* at 69:12 – 71:11; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 42). But he did not serve on active duty all the way through September 29, 2021. *See* Pl. Dep. Tr. Day 1, at 71:18-20 (Dckt. No. 39-3).

Washington had a serious medical condition stemming from a botched heart procedure he received while on duty in Kuwait. *Id.* at 72:13-24. His condition worsened over time, leading to his medical retirement from the military on July 31, 2021. *Id.* at 71:21 – 72:10; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 20.

After his most recent military leave and his medical retirement from the military, Washington sought sick leave under the federal Family and Medical Leave Act ("FMLA"). *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21 (Dckt. No. 42). Cook County initially granted him sick leave from July 1, 2021 to August 31, 2021. *See* Pl. Dep. Tr. Day 1, at 73:4-11 (Dckt.

4

No. 39-3).  And his sick leave was extended several times, eventually lasting until February 28,

2022.  *Id.* at 73:12 – 77:1; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 20–21.

## III.    Washington's Return to Work

The story kicks into high gear with Washington's return to work.  But first, this Court

needs to set the table with a few details about the organizational tree at Stroger Hospital.

Recall that Washington reported to the Director of Food and Nutrition Services, who in

turn reported to the Executive Director of Operations and Support Services.

When Washington returned to work in February 2022, Lena Washington was the Director

of Food and Nutrition Services, and Adam Weber was the Executive Director of Operations and

Support Services.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 24, 29 (Dckt. No. 42).  Lena

Washington worked for a third-party contractor called Morrison Healthcare, not Cook County.

*See* Pl. Dep. Tr. Day 2, at 18:6 – 19:5 (Dckt. No. 39-5).

As an aside, the case involves two Washingtons – Plaintiff Justin Washington, and Lena

Washington (the Director).  For the sake of simplicity, this Court will use "Washington" or

"Justin Washington" to refer to Plaintiff, and will use the full name for Lena Washington.

Back to the story.  At first, Washington's return to work looked like it would go

smoothly.  A week before Washington returned to work in late February 2022, his medical

provider submitted his list of work restrictions to the Cook County Employee Health Services

("EHS").  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 42).  Lena Washington

called Justin Washington and told him that he could return to work with those restrictions.  *Id.*;

*see also* Pl. Dep. Tr. Day 2, at 46:7 – 47:19 (Dckt. No. 39-5).

And EHS seemed like it was on top of monitoring Justin Washington's work restrictions.

EHS requested that Washington return to EHS every 60 to 90 days with doctor statements and

updated restrictions.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 42).  EHS

reviewed his restrictions twice:  once on May 3 and once on July 6.  *See* Pl. Dep. Tr. Day 1, at

85:13 – 87:2 (Dckt. No. 39-3).  After August 2022, EHS did not request that Washington return

with any more updates.  *Id.* at 93:12-19.

As it turned out, things didn't go well for Washington over the ensuing months after his

return.  The record tells Washington's story through a series of emails.

### A.  Washington's July 5 Email

On July 5, Washington emailed Richard Meier,[1] who was a Cook County Equal

Employment Opportunity ("EEO") officer.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37

(Dckt. No. 42).

His email started by noting that he originally sent a complaint to Nicholas Krasucki on

March 7.  *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5).  The email dated July 5 then raised two main

issues.

First, Washington was not happy about Cook County's accommodations for his work

restrictions.  He felt like the accommodations were not enough to make his job manageable with

his restrictions.

---

[1] The parties agree that this email was sent on July 5, 2022.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (Dckt. No. 42).  The actual email included in Plaintiff's exhibits appears to have been sent on July 4, 2022.  *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5).  It is unclear whether the July 4 email is different from the July 5 email referenced in Plaintiff's Statement of Facts.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 11 (Dckt. No. 45).  In the Court's view, these references are to the same email, since the July 4 email is the email that Meier responded to on July 5.  *See* Pl.'s Ex. 4, at 24.  Since both parties seemingly agree that there is a July 5 email, the Court will treat the July 4 email as being sent on July 5.  *See, e.g.*, Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 12.  The parties also agree that this email was sent to Richard Meier.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (Dckt. No. 42).  The email included in Plaintiff's exhibits appears to have been sent to Carrie Pramuk-Volk and human resources.  *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5).  In any event, Meier is the one who replied to the email.  *Id.*

6

As he wrote in the email: "[M]y job has not been modified to fit my restrictions. . . . The nature of my job involves supervising line employees which means I am still on my feet for more than 2 hours every day directing employee[] duties or doing employee duties that also is defying my work restrictions. . . . I think most would agree you can supervise mostly desk workers from a desk, but not people doing multiple tasks in the kitchen and on the floors from a desk." *Id.*

Second, Washington complained that he was facing "hostilities and retaliation." *Id.* In particular, he felt that Lena Washington was retaliating against him for his previous complaint to Krasucki about his accommodations.

As he put it: "Mr. Krasucki sent my original complaint to Lena Washington . . . . The next morning, I got door slamming and eye rolling, without a word spoken to me, on the second day I asked to speak with her. . . . Since then, several food service workers, a couple of Morrison managers, [and] a county supervisor have detailed unprofessional and even defamatory statements she has made to them about me. Those statements were untrue and very negative, like 'Justin is the cause of all the chaos in the department,' or 'Justin does not do anything.'" *Id.* at 24–25.

At bottom, Washington's email asked for a job transfer. *Id.* at 25. He said that a job transfer would be "the only fair course of action," and the "only action [he] would consider as fair accommodation." *Id.* at 25.

Meier responded on July 5. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 38 (Dckt. No. 42). Meier explained that Washington would have to start the accommodations process over again. *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5). Meier asked Washington to resubmit any restrictions to EHS. *Id.* EHS would then notify Meier of whether Washington could return to

work with restrictions.  *Id.*  Meier also said he would try to find a position that could accommodate Washington's disability, if possible.  *Id.*

### B.     EHS's July 6 Email

The next day, EHS emailed Lena Washington, restating Justin Washington's restrictions: (1) "Light Lifting – can lift/carry/push/pull under 15 pounds 1 hour a day," (2) "Occ[assionally] stand, walk, bend, stoop, crouch, twist, climb, squat, kneel, push, pull, reach above shoulder level, balance, operate motor vehicle," and (3) "Minimal exertional activity.  He can do desk work.  No more than 2 hours of physical activity.  This condition is permanent."  *Id.* at 27.

Lena Washington replied to EHS later that day, stating that "Justin Washington's temporary restrictions listed below can be accommodated."  *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 41 (Dckt. No. 42).

Lena Washington also emailed Justin Washington that same day, letting him know about some new accommodations.  The gist of it was that he was getting a new workplace closer to the kitchen.  Since his role was to supervise the kitchen employees, being closer to the kitchen could theoretically help him minimize his daily exertion.  *See* Pl. Dep. Tr. Day 1, at 174:9 – 175:11 (Dckt. No. 39-4).

As she explained:  "To further accommodate your work restrictions and to minimize your exertional activities, on Friday, July 8th, 2022, your primary office space will transition from the Nutrition, business office, to the diet office, located inside the food service operation.  A new desk and chair will be provided to you for your conv[eni]ence. . . . A team of movers will be available to assist you at your request to lift anything heavier th[a]n 15 pounds to your new and more convenient assigned work area."  *See* Pl.'s Ex. 4, at 29 (Dckt. No. 43-5).

### C.     Unger's August 2 Email

The accommodations weren't Justin Washington's only problem.  He allegedly broke some of Cook County's personnel rules, too.

On August 2, Kristin Unger (a Clinical Nutrition Manager and Morrison employee), sent Washington an email asking him to appear at a meeting on August 10.  *See* Pl.'s Ex. 4, at 30 (Dckt. No. 43-5).  The meeting had been initiated by Morrison employees (namely, Lena Washington).  *See* Weber Dep. Tr., at 54:7-10 (Dckt. No. 39-7).

The purpose of the meeting was to discuss two separate "major cause" infractions of Cook County's personnel rules, which could warrant written reprimand.  *See* Pl.'s Ex. 4, at 30. Summaries of the rule violations were attached to the email.  *Id.*

The first violation involved Justin Washington allegedly missing the daily dietician meetings.  *Id.* at 32.  Lena Washington had directed him to attend four separate times:  on June 23, June 27, June 28, and July 12.  *Id.*  Nonetheless, Justin Washington repeatedly missed the daily meetings – 17 different times between June 29 and July 26 (including on July 12).  *Id.*

The second violation involved Justin Washington allegedly refusing to follow the directions of Executive Chef Armando Serrano.  *Id.* at 34.  In response to supply-chain shortages, management had decided to prepare fruit juice from concentrate for patient meal trays, and packaged lemonade was obtained only to stock patient-nourishment refrigerators.  *Id.*  So, Serrano instructed Washington not to use the lemonade for meal trays.  *Id.*  But Washington replied, "I am a Dietitian IV.  I am authorized to make this decision."  *Id.*  Washington used the lemonade on meal trays anyways, against Serrano's instructions.  *Id.*

The pre-disciplinary meeting ultimately did not take place until months after Unger's email, because Justin Washington happened to take paid time off from August 2 (the day

Unger's email was sent) to September 26.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 44 (Dckt. No. 42); *see also* Pl. Dep. Tr. Day 1, at 117:17 – 118:1 (Dckt. No. 39-3).

### D.    Dr. Nimmagadda's August 3 Email

While he was taking time off, Justin Washington presented to EHS again on August 3. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 45.  EHS referred his case to Meier (the EEO officer).  *Id.*

Afterwards, Dr. Anitha Nimmagadda, the Medical Director of EHS, sent an email to Lena Washington with new restrictions for Justin Washington.  *See* Pl.'s Ex. 4, at 28 (Dckt. No. 43-5).  Those restrictions were:  (1) "Desk work mostly," (2) "Limit active work (standing, manual labor) < 1 hour," (3) "Sit frequently," (4) "Stand, walk, bend/stoop/crouch, twist, climb, squat, kneel, push/pull, reach above shoulder level, balance occasionally," and (5) "Light lifting – lift/carry/push/pull under 15 pounds 1 hour/day."  *Id.*

Dr. Nimmagadda's email asked Lena Washington to "advise if these temporary restrictions can be accommodated."  But the email also noted that Meier doubted that the new restrictions could work for Justin Washington's then-current position.  *Id.*

On August 4, Weber (the Executive Director and Lena Washington's supervisor) replied to Dr. Nimmagadda, stating that Justin Washington's "temporary restrictions of approximately 90% desk work, cannot be accommodated in his current position as Dietitian IV."  *See* Pl.'s Ex. 1, at 5 (Dckt. No. 43-2).  Simply put, Weber thought there was a fundamental mismatch between Washington's job responsibilities and his restrictions.

As Weber's email explained:  Justin Washington's "primary job duties . . . [are] to supervise and direct activities of the [f]ood service workers, and supervisors.  This includes the monitoring of about 2000 patient meals, daily.  The daily operations of the Food and Nutrition

10

department require the ability to frequently stand, walk, bend/stoop/crouch, twist, climb[,] squat, kneel, push, pull, reach above shoulder level[,] and balance." *Id.*

### E. Washington's August 5 Email

Early in the morning of August 5, Justin Washington sent a follow-up email to Meier. *See* Def.'s Ex. 5, at 28 (Dckt. No. 39-11). In it, he requested written confirmation that the department would be declining to accommodate his restrictions. *Id.*

A couple hours later, Lena Washington sent an email to Justin Washington to that effect, borrowing the language from Weber's email explaining that Justin Washington's new restrictions could not be accommodated to the Dietitian IV position. *Id.* at 27; *see* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 15 (Dckt. No. 45).

Later that day, Meier emailed Justin Washington to follow up with two possible options going forward. *See* Def.'s Ex. 5, at 31 (Dckt. No. 39-11).

His first option was to switch positions and become a Dietitian III (which would not require an interview). *Id.* Alternatively, he could stay in his current position as a Dietitian IV – but he would receive only the original accommodations as outlined by Lena Washington in her July 6 email. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 47 (Dckt. No. 42). In other words, if he stayed as a Dietitian IV, he would not receive any additional accommodations for his new work restrictions that Dr. Nimmagadda outlined in her August 3 email.

A few days later, on August 8, Justin Washington emailed Meier, essentially stating that he felt forced to take a new position because of the lack of accommodations in his current position and the retaliation he was facing from Lena Washington.

He started his email by thanking Meier for his "willingness to begin an interactive process." *See* Pl.'s Ex. 4, at 36 (Dckt. No. 43-5). He reiterated the "non-modifications of [his]

essential duties, on-going restrictions violations, [and] workplace bullying/harassment with escalation of retaliatory acts." *Id.* He then explained that, based on Lena Washington's August 5 email indicating that the Dietitian IV position could not be accommodated to meet his restrictions, "there is no choice to make." *Id.* at 37. He ended by saying that he was "willing to move into any position that fits USERRA steps for [d]isabled returning vets with equivalent pay, status[,] and seniority[,] and meets [his] work restrictions." *Id.*

Later that August, Justin Washington had two meetings of interactive process to discuss possible accommodations. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 42). A month later, on September 4, Washington applied for a new position as an Administrative Analyst III at Cermak Hospital, another Cook County facility. *Id.* at ¶ 7.

IV. **Washington's Disciplinary History**

On October 4, Justin Washington finally participated in a pre-disciplinary hearing about the conduct described in Unger's August 2 email. *Id.* at ¶ 49; Weber Dep. Tr., at 54:7-10 (Dckt. No. 39-7).

Weber (the Executive Director) presided as the hearing officer. *See* Weber Dep. Tr., at 55:5-6. Lena Washington also attended, as did Unger and three union representatives. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 50 (Dckt. No. 42); Pl. Dep. Tr. Day 1, at 147:23 – 148:4 (Dckt. No. 39-4).

As the hearing officer, Weber did not have the authority to discipline Washington at the hearing. *See* Weber Aff., at ¶ 9 (Dckt. No. 39-14). Rather, he could only make a recommendation to human resources. *Id.*

12

Unger recommended that Washington be terminated. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 23 (Dckt. No. 45). But Weber recommended only a written warning for Washington. *See* Weber Aff., at ¶ 9 (Dckt. No. 39-14).

Weber doesn't know whether human resources ever issued the warning. *Id.*

Indeed, Washington never found out the results of the hearing, and he never received any written warning. *See* Pl. Dep. Tr. Day 1, at 148:8-17 (Dckt. No. 39-4); Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 29 (Dckt. No. 45).

In fact, Washington has never been suspended without pay, terminated, or otherwise received a written reprimand or counseling. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 53 (Dckt. No. 42). And there is no record of any discipline in Washington's personnel file. *See* Groves Aff., at ¶¶ 3–4 (Dckt. No. 39-15).

## V. Washington's New Position

On December 12, 2022, Washington interviewed for the Administrative Analyst III position at Cermak Hospital. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 42). He accepted the position on February 15, 2023. *Id.* at ¶ 9.

When he assumed his new role, Washington was placed on probation for a year, meaning that he was "subject to at will employment without seniority and lay-off bumping rights." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 32 (Dckt. No. 45); Washington Aff., at ¶ 13 (Dckt. No. 43-3). So, Washington lost his career service status because of the job change. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 33. Washington was also no longer eligible for overtime wages in his new role. *Id.* at ¶ 34.

13

## VI.     The Lawsuit at Hand

Washington sued in March 2023, bringing a litany of claims stemming from his military service from 2018 to 2021.  *See* Cplt. (Dckt. No. 1).  Importantly, the parties have settled many of the claims, so they have whittled down the dispute.

First, he brought pay-differential claims (Counts I and II) that Cook County did not pay him the differential between his military pay and what he would have earned at Cook County, in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, and the Illinois Services and Reemployment Rights Act ("ISERRA"), 330 ILCS 61 *et seq.*  *See* Cplt., at ¶¶ 2–3 (Dckt. No. 1).  Those claims have since settled.  *See generally* Mtn. to Dismiss (Dckt. No. 33).

Washington also brought pension-benefit claims (Counts III, IV, and V) that Cook County did not credit him all the pension benefits that he was entitled to while serving in the military, in violation of IWPCA, USERRA, and ISERRA.  *See* Cplt., at ¶¶ 4–5 (Dckt. No. 1).  Those claims have also settled.  *See generally* Mtn. to Dismiss (Dckt. No. 33).

Next, he brought reinstatement claims (Counts VI, VII, VIII, and IX), alleging that Cook County did not reemploy him in a position of like seniority, status, and pay after he returned from his active military service, in violation of USERRA, ISERRA, the Illinois Service Member's Employment Tenure Act ("ISMETA"), 330 ILCS 60/1 *et seq.*, and the Illinois Municipal Employees Military Active Duty Act, 50 ILCS 120/1 *et seq.*  *See* Cplt., at ¶¶ 6–7 (Dckt. No. 1).  Of those claims, only his claim under the Illinois Municipal Employees Military Active Duty Act (Count IX) has settled.  *See* Mtn. to Dismiss (Dckt. No. 33).

Washington also brought a claim (Count X) that Cook County failed to accommodate his injuries and disabilities in violation of USERRA.  *See* Cplt., at ¶¶ 8–9 (Dckt. No. 1).

Last, he brought retaliation claims (Counts XI and XII) under USERRA and ISERRA that Cook County harassed him and subjected him to a hostile work environment in retaliation for his previous exercise of his rights in 2013. *Id.* at ¶¶ 10–11.

Washington also brought claims against Morrison Healthcare (the third-party contractor that employed, among others, Lena Washington). *Id.* But Washington has since settled those claims. *See generally* Pl.'s Mtn. to Dismiss Def. Morrison Healthcare (Dckt. No. 46).

So, here's the score. Washington has settled all of his claims against Morrison Healthcare. He's also settled some of his claims against Cook County: Counts I, II, III, IV, V, and IX have all been dismissed from the case, too.

As things stand, six claims remain in the case: Counts VI, VII, VIII, X, XI, and XII. Those are Washington's reinstatement claims under ISERRA, USERRA, and ISMETA (Counts VI, VII, and VIII), his failure-to-accommodate claim under USERRA (Count X), and his discrimination and retaliation claims under USERRA and ISERRA (Counts XI and XII).

At this point, if you don't feel like you're getting fed alphabet soup, you're not paying attention. Not everyone like acronyms. They're ugly, and potentially confusing. The ALLCAPS make it seem like someone is yelling, too.

Still, it would get cumbersome to write out the full name of each of the statutes. So, against its better judgment, the Court will reluctantly use them.

Cook County has moved for summary judgment on Washington's remaining claims. *See* Mtn. for Summ. J. (Dckt. No. 37).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the non-moving party, giving the non-moving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Washington brings a few different claims under a few different statutes. He brings claims under the Uniformed Services Employment and Reemployment Rights Act (again, USERRA), the Illinois Services and Reemployment Rights Act (again, ISERRA), and the Illinois Service Member's Employment Tenure Act (again, ISMETA).

If you're intimidated by the alphabet soup of statutes, you're not alone. Fortunately, the Court needs to do a deep dive into only one statute – USERRA. ISERRA is derivative of USERRA. And ISMETA was repealed.

16

As a general matter, ISERRA (the state statute) simply incorporates the provisions of USERRA that create federal rights, and thus grants those same rights under state law. *See, e.g.*, 330 ILCS 61/5-5 ("This Section incorporates Sections . . . 4312[ and] 4313 . . . of [USERRA] . . . including case law and regulations promulgated under that Act."). ISMETA did the same thing, before it was repealed in 2019.

In other words, Washington's state-law claims will rise and fall with his federal claims under USERRA. So, this Court will start with an overview of USERRA, which will lay the groundwork for discussing all of Washington's claims.

"USERRA entitles returning servicemembers to certain reemployment rights in order to ensure that they are not punished for their service." *Brown v. Con-Way Freight, Inc.*, 891 F. Supp. 2d 912, 916 (N.D. Ill. 2012). The statute aims to "prohibit discrimination against persons because of their service in the uniformed services," and to "provid[e] for prompt reemployment of such persons upon their completion of such service." *See* 38 U.S.C. § 4301(a).

The Seventh Circuit has explained that "the USERRA is to be liberally construed in favor of those who served their country." *McGuire v. United Parcel Serv.*, 152 F.3d 673, 676 (7th Cir. 1998). That said, "courts are not superpersonnel departments charged with determining best business practices." *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (cleaned up).

As relevant here, USERRA provides two different kinds of rights related to reemployment. One is a right to reemployment for returning servicemembers. *See* 38 U.S.C. §§ 4312, 4313. The other is a right for returning servicemembers to be free of discrimination and retaliation on the basis of military service. *See* 38 U.S.C. § 4311.

Washington brings claims about both rights. For the right to reemployment, he brings four claims: three identical reinstatement claims (under USERRA, ISERRA, and ISMETA) and

17

one failure-to-accommodate claim under USERRA. For the right against discrimination, he brings two identical retaliation claims (under USERRA and ISERRA).

The Court will address each in turn.

## I.     The Right to Reemployment

USERRA provides a right to reemployment for a returning servicemember. *See* 38 U.S.C. § 4312(a). USERRA lays out a detailed framework to determine the positions that a veteran is entitled to hold upon returning from military service. *See* 38 U.S.C. § 4313.

"[A] veteran typically is entitled to be reemployed in the position which he would have occupied if his work had not been interrupted by his service." *Brown*, 891 F. Supp. 2d at 917 (citing 38 U.S.C. § 4313(a)(2)(A)). "This position is known as the escalator position." *See* 20 C.F.R. § 1002.191.

"The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service." *Id.*

In a nutshell, the escalator position is the position that the returning servicemember likely would have had, if the soldier had not taken military leave.

That said, USERRA recognizes that the escalator position may not be available for various reasons. *Id.* ("Depending upon the specific circumstances, the employer may have the option . . . to reemploy the employee in a position other than the escalator position.").

As such, the statute provides that a returning veteran may also be employed in "a position of like seniority, status and pay" to the escalator position, "the duties of which the person is qualified to perform."  *See* 38 U.S.C. § 4313(a)(2)(A).

If the returning veteran is not qualified to perform the duties of the escalator position, or a position of like seniority, status, and pay to the escalator position (after reasonable efforts by the employer to qualify the person), then that person may be employed "in the position of employment in which the person was employed on the date or commencement of service in the uniformed services, or a position of like seniority, status and pay."  *Id.* at § 4313(a)(2)(B).

"In the case of a person who has a disability incurred in, or aggravated during, such service, and who (after reasonable efforts by the employer to accommodate the disability) is not qualified due to such disability to be employed in the [escalator position]," the returning veteran may be employed "in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer."  *Id.* at § 4313(a)(3)(A).

ISERRA provides identical rights to reemployment under state law by incorporating those sections of USERRA.  *See* 330 ILCS 61/5-5 ("This Section incorporates Sections . . . 4312 [and] 4313 . . . of [USERRA] . . . including case law and regulations promulgated under that Act.").

This Court will address the three reinstatement claims, before turning to the failure-to-accommodate claim.

### A. Reinstatement Claims (Counts VI, VII, and VIII)

Washington brings three identical reinstatement claims under three different statutes.

In Count VI, Washington asserts that, upon his return from military service, Cook County did not reemploy him in a position that complies with the requirements of USERRA. *See* Cplt., at ¶¶ 120–28 (Dckt. No. 1). In other words, he argues that he was not reemployed in the escalator position. He also brings identical claims under ISERRA and ISMETA (in Counts VII and VIII, respectively). *Id.* at ¶¶ 129–38.

This Court will start with the low-hanging fruit: Washington's ISMETA claim. Washington doesn't have a cause of action under ISMETA. The statute was repealed.

ISMETA formerly provided a right to reemployment, similar to the right that ISERRA provides now. *See* Ill. Pub. Act 88-518; *see also* 330 ILCS 60/4, *repealed by* Service Member Employment and Reemployment Rights Act, 330 ILCS 61 *et seq.* But the section that formerly provided the right in question was repealed by ISERRA, effective January 1, 2019. *See* 330 ILCS 61/90-55 ("The Service Member's Employment Tenure Act is amended by repealing Sections 4, 4.5, 5, 6, 7, and 8.").

The repeal predates Washington's return from service, so Washington doesn't have a cause of action under the repealed statute. The Court thus grants summary judgment to Cook County on Washington's reinstatement claim under ISMETA in Count VIII.

That leaves Washington's reinstatement claims under USERRA and ISERRA. Based on the record, this Court concludes that there is no genuine dispute as to any material fact, and that Cook County is entitled to judgment as a matter of law on Counts VI and VII.

Washington claims that he was not reemployed in the escalator position as required by USERRA and ISERRA. That's tough sledding on this summary-judgment record.

The parties agree that Washington was employed as a Dietitian IV before he left for military service, and that he was employed as a Dietitian IV when he came back from his

20

service. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 42). His pay grade and title did not change throughout his employment as a Dietitian IV. *Id.* at ¶¶ 4–5. So, the question is whether Dietitian IV was the escalator position.

The escalator position is the one that Washington would have had, if his military service had not interrupted his civilian job. So, the Court needs to examine Washington's career trajectory.

For over ten years before he left for military service, Washington was employed as a Dietitian IV at pay grade 20. *Id.* at ¶ 4. During that time, he was never promoted, because there was no Dietitian V role at the hospital that he could have been promoted to. *Id.* at ¶ 6; *see also* Collective Bargaining Agreement, at 50 (Dckt. No. 12-2); Pl. Dep. Tr. Day 2, at 54:9 – 56:21 (Dckt. No. 39-5).

The record offers no reason to think that he would have been promoted to a different role in the years that he was gone for military duty. So, the Court concludes that Washington likely would have remained a Dietitian IV, even if he had not left for active-duty service. He couldn't go up, because there was nowhere to go.

Based on these facts, the Dietitian IV position is the escalator position. It "reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that [Washington] would have attained if not for the period of service." *See* 20 C.F.R. § 1002.191.

Washington disagrees. He thinks that Dietitian IV was not a true escalator position because he did not have the same duties and responsibilities that he had before he left. *See* Cplt., at ¶¶ 122–23 (Dckt. No. 1).

Washington supports that argument with two points. First, when he returned from military service, Washington was managed by a subordinate to the Director of Food and

21

Nutrition. *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 6–7 (Dckt. No. 41). Second, when he returned, he lost the ability to discipline subordinates. *Id.*

Washington's first point lacks evidentiary support. The record shows that upon Washington's return, he reported directly to Lena Washington, who was the Director of Food and Nutrition Services. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 24–25 (Dckt. No. 42). Both parties agree on that fact. *Id.* So Washington wasn't supervised by a subordinate to the Director of Food and Nutrition – he reported to the Director herself.

Washington's second assertion is about his ability to discipline subordinates. On that issue, there is a disputed question of fact. The record is mixed about whether Washington had that power before his military service.

Some evidence shows that, even before he took military leave in 2018, Washington lost the ability to discipline other employees as a result of the 2017 settlement agreement. *See* Pl. Dep. Tr. Day 1, at 81:20 – 84:8 (Dckt. No. 39-3) ("A: Eventually I was no longer allowed to discipline, but at first I still could give disciplinary action. Q: Anything else change? A: Prior to 2021? Q: As a result of the 2017 settlement. A: Prior to 2021? Q: Yes. A: No.").

In contrast, other evidence shows that Washington's job duties before leaving for military service in 2018 included the ability to discipline employees. *Id.* at 46:15-17 ("Q: Any other duties that you can recall? A: Also train, instruct, schedule, discipline.").

In sum, there is evidence on both sides of the scale about whether Washington had the ability to discipline subordinates before he left for active military duty. There is some evidence in the record that, after he returned to work, his job responsibilities changed when it came to that topic. *See* Washington Aff., at ¶ 4 (Dckt. No. 43-3).

22

But that factual dispute is not material. That is, the ability to discipline subordinates is not material to whether the Dietitian IV position was the escalator position.

USERRA does not require job responsibilities to be set in stone. They can change, without running afoul of the statute. USERRA "does not require that an employee's job duties and responsibilities remain unchanged regardless of the needs of the employer or changes in the workplace. The employee's right to reemployment is not the right to insist that his job forever remain the same." *Weaver v. Madison City Bd. of Educ.*, 2016 WL 7210447, at *15 (N.D. Ala. 2016). "The USERRA regulations recognize that an employer's reemployment offer may be affected by changes in staffing or work priorities." *Woodard v. N.Y. Health and Hosps. Corp.*, 554 F. Supp. 2d 329, 356 (E.D.N.Y. 2008).

Here, Washington's position was the same. His pay grade and level of seniority were the same. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 4–5 (Dckt. No. 42). Whether he had subordinates staffed below him does not change those facts.

On this record, a loss of an ability to discipline subordinates is not the same thing as a loss of seniority. It is not as if Washington's former associates got promoted, and he stayed in the same place. He didn't lose ground compared to anyone else.

This Court's role is not to act as a "superpersonnel department." *Stockwell*, 597 F.3d at 902. USERRA does not require Cook County to hire subordinates for Washington for the sole purpose of giving Washington subordinates to discipline.

Washington agrees that USERRA "do[es] not mandate that an employee's duties and responsibilities are unchangeable and are somehow exempted from operational realities over the course of a three-year and seven-month absence." *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for

Summ. J., at 7 (Dckt. No. 41). He concedes that USERRA does not prohibit changes to the escalator position in response to operational realities.

So, Washington reframes his argument. He complains that "he was told his accommodations would be granted but they were not honored, was subjected to harassment and a hostile work environment, and when he complained about that, among other things, was subjected to an unwarranted disciplinary hearing and forced to request a transfer." *Id.*

Even assuming that those facts were true, they don't support the argument that he was not placed in the escalator position. Rather, those facts suggest that he was not appropriately accommodated in the escalator position and that he was discriminated against because of his military service.

This Court will examine those arguments more closely below when it considers Count X (the failure-to-accommodate claim), and Counts XI and XII (the retaliation claims). But those arguments do not support Washington's claims in Counts VI and VII that he was not actually placed in the escalator position upon his return from military service.

There is no genuine dispute as to any material fact that Washington was placed in the escalator position upon his return. The Court grants summary judgment to Cook County on Count VI (the reinstatement claim under USERRA) and Count VII (the reinstatement claim under ISERRA).

### B.     Failure-to-Accommodate Claim (Count X)

The next claim is about an alleged failure to accommodate a disability.

In Count X, Washington claims that Cook County violated USERRA by failing to make reasonable efforts to accommodate his disability upon his return from service, and failing to

place him in another position equivalent in seniority, status, and pay that he was qualified to perform. *See* Cplt., at ¶¶ 148–54 (Dckt. No. 1); *see also* 38 U.S.C. § 4313(a)(3)(A).

Before driving down that road, this Court needs to start with a small detour to clarify that USERRA does not require a plaintiff to prove discrimination as part of a failure-to-accommodate claim.

Cook County first argues that Washington's claim fails because he didn't prove that he was discriminated against because of his military service. *See* Def.'s Mem. in Supp. of Mtn. for Summ. J., at 8 (Dckt. No. 38). So, both parties argue a great deal about whether Washington has proved discrimination. *See, e.g.*, Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 8–10 (Dckt. No. 41). Those arguments miss the mark.

True, Washington does bring other claims that sound in discrimination – namely, his retaliation claims under USERRA and ISERRA (Counts XI and XII). He brings those claims under the section of USERRA that deals with discrimination, 38 U.S.C. § 4311, and the corresponding section of ISERRA.

But his claim in Count X (under USERRA) is not a claim of discrimination. He brings his claim under the sections of USERRA that deal with the right to reemployment, not discrimination. *See* 38 U.S.C. §§ 4312, 4313.

Those sections do not require evidence of discrimination. "[T]o sustain a reemployment claim under §§ 4312 and 4313, a veteran need not prove discrimination on the basis of military service." *See Brown*, 891 F. Supp. 2d at 917; *see also* 20 C.F.R. § 1002.33 ("The employee is not required to prove that the employer discriminated against him or her because of the employee's uniformed service in order to be eligible for reemployment.").

Simply put, Washington doesn't need to prove that he was discriminated against (at least for this claim). Washington's claim in Count X is that Cook County did not take reasonable efforts to accommodate his disability upon return from service. That claim doesn't require proof of discrimination.

The relevant question for this claim is whether Cook County made reasonable efforts to accommodate Washington. If Cook County made those reasonable efforts, but Washington nonetheless was unqualified for the role, then there's a second question. The next question is whether Cook County placed him in another equivalent position that he was qualified to perform or the nearest approximation to that position. *See* 38 U.S.C. § 4313(a)(3)(A)–(B).

The Court will address each question in turn.

### 1. Reasonable Efforts

The Court first considers whether Cook County made reasonable efforts to accommodate Washington. An employer "must make reasonable efforts to accommodate [the] disability and to help the employee become qualified to perform the duties of his or her reemployment position." *See* 20 C.F.R. § 1002.225. And an employee is qualified when "the employee has the ability to perform the essential tasks of the position." *Id.* at § 1002.198.

It is undisputed that Washington submitted his medical restrictions in late February 2022, and his immediate supervisor, Lena Washington, said that he could return to work (as a Dietitian IV) with those restrictions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 42).

The Cook County Employee Health Services ("EHS") reviewed those medical restrictions as well. *Id.* at ¶ 34. And EHS told him that he should update EHS every 60 to 90 days with doctor statements and any new or updated medical restrictions. *Id.* at ¶ 35.

26

So, all the evidence so far supports that Cook County made reasonable efforts to accommodate Washington.

Nonetheless, Washington contends that his accommodations were not actually honored. *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 11 (Dckt. No. 41).

He begins with March 2022. Washington claims that he sent an email to the Equal Employment Office on March 7, 2022, stating that his work restrictions were not being followed. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 9 (Dckt. No. 45).

However, that email is not in the record. Washington does not offer testimony that he sent that email, either. He does not point to any deposition testimony about any March 7 email. *See generally* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J. (Dckt. No. 41). And he doesn't offer an affidavit to support the notion that he sent an email on March 7, either. *See generally* Washington Aff. (Dckt. No. 43-3).

The only thing in the record pointing to the existence of the March 7 email is Washington's July 5 email, which said that he sent an email to Krasucki on March 7. *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5). So, Washington points to an email from July 5, which claims that he sent an email on March 7.

But Washington's July 5 email runs into a hearsay problem. Washington wants to use his out-of-court email to prove the "truth of the matter asserted in the statement." That is, he offers the July 5 email for its truth, meaning that he sent an email on March 7 stating that his work restrictions were not being followed. *See* Fed. R. Evid. 801(c) (defining hearsay). The Court does not see a relevant exception to the hearsay rule, and Washington has not offered any.[2] *See generally* Fed. R. Evid. 803.

---

[2] To be precise, Washington's use of the July 5 email presents a *double*-hearsay problem, if the point is the *truth* of the March 7 email. He wants to use the July 5 email to prove that he sent the March 7 email,

27

On summary judgment, the Court considers "only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence." *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). So, the July 5 email doesn't help Washington.

Washington also argues that his restrictions were not honored, resulting in hospitalization in March 2022 and treatment by Dr. Nimmagadda. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 10 (Dckt. No. 45). As support, Washington points to an untitled document in the record.

The document itself is a bit of a mystery. Frankly, it is not even clear what the document is. The document appears in the middle of a longer exhibit, sandwiched between two different emails in a 39-page exhibit. *See generally* Pl.'s Ex. 4 (Dckt. No. 43-5). The top of the document contains a paragraph of typewritten text, perhaps in Word, and the bottom of the document is a table of hospitals and physicians. The document seems to come out of nowhere.

Putting that aside, the document purports to summarize bad things that happened to Washington. The document says that "[d]ue to the non-existent modifications, vengeful retaliatory acts, and negligence to acknowledge or comply with USERRA and the Cook County's military policy for disabled returning veterans my cardiac medical condition worsened coupled with professional slander, personal and professional humiliation." *Id.* at 26.

To the extent that this document states a legal conclusion, that statement is not part of the factual record. *See TWD, LLC v. Grunt Style LLC*, 598 F. Supp. 3d 676, 684 (N.D. Ill. 2022) (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)) ("Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded.").

---

and he wants to use the March 7 email to support the notion that his work restrictions were not being followed. That's hearsay within hearsay. Even if the March 7 email were in the record, Washington's statement in that email that his work restrictions were not being followed would still be hearsay.

And to the extent that the document makes a factual claim, it suffers from the same inadmissible-hearsay problem as the alleged March 7 email. It is an out-of-court statement offered to prove "the truth of the matter asserted in the statement." *See* Fed. R. Evid. 801(c). That is, it is offered to prove that his work restrictions were not followed.

In sum, there is no admissible evidence showing that Washington did not receive accommodations in March 2022. On the contrary, the admissible evidence shows that Washington submitted his medical restrictions, and that his supervisor granted him accommodations to meet those restrictions. So, from his return to work in February 2022 until March 2022, the record shows that Cook County made reasonable efforts to accommodate Washington.

Washington next turns to July 2022. He points to the email that he sent to the EEO on July 5, stating that "my job has not been modified to fit my restrictions." *See* Pl.'s Ex. 4, at 24 (Dckt. No. 43-5).

Again, an out-of-court email from Washington is inadmissible hearsay if it is offered to prove the truth of the matter asserted – here, that his work restrictions were not being followed in July 2022. *See* Fed. R. Evid. 801(c). Washington does not point to a relevant hearsay exception. *See generally* Fed. R. Evid. 803. So, there is no admissible evidence that his accommodations were not being followed in July 2022.

On the other side, there is some evidence that Washington received additional accommodations from Cook County. For example, Lena Washington's July 6 email indicated that Cook County would provide new accommodations. *See* Pl.'s Ex. 4, at 29 (Dckt. No. 43-5). And unlike Washington's email, a hearsay exception does apply to Lena Washington's email.

29

The email said that Washington's "primary office space will transition from the Nutrition, business office, to the diet office, located inside the food service operation." *Id.* His new workspace was closer to the kitchen, where his role was to supervise the kitchen employees. *See* Pl. Dep. Tr. Day 1, at 174:9 – 175:11 (Dckt. No. 39-4). The email also said that Washington would receive "[a] new desk and chair" and "[a] team of movers will be available to assist you at your request to lift anything heavier then [sic] 15 pounds to your new and more convenient assigned work area." Pl.'s Ex. 4, at 29 (Dckt. No. 43-5).

True, Lena Washington's email would be hearsay if offered for its truth. *See* Fed. R. Evid. 801(c). But the email falls within the exception for evidence about a state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . . A statement of the declarant's then-existing state of mind (such as motive, *intent*, or *plan*) . . . .") (emphasis added).

Lena Washington's email describes, in the future tense, her plan to accommodate Justin Washington. *See, e.g.*, Pl.'s Ex. 4, at 29 (Dckt. No. 43-5) (noting that Washington's "primary office space *will* transition") (emphasis added). So, her email is admissible evidence to show that Cook County planned and intended to accommodate Washington in July 2022, too.

In sum, the only admissible evidence shows that Lena Washington granted Justin Washington more accommodations for his restrictions in July 2022. So, the record shows that Cook County made reasonable efforts to accommodate him in July 2022, too. And there nothing on the other side of the evidentiary ledger. There is no genuine dispute of material fact, because Cook County has presented admissible evidence on its side, while Justin Washington has not presented any. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

As an aside, the Court notes that there is a difference between making reasonable efforts to give accommodations (on the one hand) and the success of those accommodations (on the other). Though Justin Washington frames his argument as alleging a failure to give reasonable accommodations, the undercurrent of his argument is a complaint that those reasonable accommodations were nonetheless unsuccessful.

In that sense, the parties may agree more than it seems at first glance. The undisputed admissible evidence shows that Cook County gave Washington reasonable accommodations, as Cook County argues. But the record also shows that the accommodations were ultimately unsuccessful (though not all of the evidence may be admissible on this point), as the Court takes the subtext of Washington's argument to be.

After all, there were emails from both sides suggesting that the accommodations Cook County gave simply weren't enough to make the Dietitian IV position feasible with Washington's work restrictions. *See, e.g.*, Pl.'s Ex. 4, at 24 (Dckt. No. 43-5) (Washington's July 5 email); Pl.'s Ex. 1, at 5 (Dckt. No. 43-2) (Weber's August 4 email).

At the end of the day, it seems that the "essential tasks" of being a Dietitian IV required lots of standing, walking, and other forms of physical activity that Washington was no longer suited to perform. *See* 20 C.F.R. § 1002.198. Both parties seemed to recognize that the accommodations weren't successful because they couldn't change those basic responsibilities.

But that doesn't mean that Cook County didn't make reasonable accommodations. As explained above, the admissible evidence shows that Cook County took reasonable efforts to accommodate Washington, multiple times. The only conclusion from the record is that, despite reasonable efforts to qualify him, Washington was not qualified to perform the duties of a Dietitian IV. *Id.*

31

At bottom, there is no genuine dispute of material fact. Cook County made reasonable efforts to accommodate Washington in his position as a Dietitian IV. Although those efforts didn't pan out, the efforts were reasonable. No reasonable jury could find otherwise.

### 2. Equivalent Position

Cook County's reasonable efforts to accommodate Washington were ultimately unsuccessful. The next question is whether Cook County placed him in another position equivalent in seniority, status, and pay that he was qualified to perform (or the nearest approximation to that position). *See* 38 U.S.C. § 4313(a)(3)(A)–(B).

Washington thinks that Cook County did not place him in an equivalent position or the nearest approximation. Cook County offered Washington a position as Dietitian III (without having to interview), or alternatively offered that he could interview for other positions. *See* Washington Aff., at ¶ 8 (Dckt. No. 43-3).

Working as a Dietitian III would have been a downgrade from working as a Dietitian IV. *Id.* at ¶ 9. But that alone doesn't disqualify Dietitian III from being the "nearest approximation" position. *See* 20 C.F.R. § 1002.225 ("A position that is the nearest approximation to the equivalent position may be a higher *or lower* position, depending on the circumstances.") (emphasis added).

And, in any event, Cook County didn't adopt a take-it-or-leave-it approach. Cook County also offered Washington the opportunity to interview for other, potentially more equivalent positions (presumably to find out if he would be qualified to perform those positions).

Indeed, Washington applied and interviewed for several other positions, including the one he later took – a position as an Administrative Analyst III at Cermak Hospital. *See* Washington Aff., at ¶¶ 10–11 (Dckt. No. 43-3). So, this Court must determine whether that

position was equivalent in seniority, status, and pay (or the nearest approximation that Washington was qualified to perform).

First, consider pay. The Administrative Analyst III position was at a higher pay grade than the Dietitian IV position. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 2, 4 (Dckt. No. 42). However, the Administrative Analyst III position was ineligible for overtime, while the Dietitian IV position was eligible for overtime. *See* Washington Aff., at ¶ 12 (Dckt. No. 43-3).

In other words, Washington's new position had a higher annual salary, but had fewer other earning opportunities. So, there is some evidence that the position was equivalent (or better) in pay, and some evidence that the position was worse in pay.

Next, consider seniority and status. In Washington's new position as Administrative Analyst III, a non-union position, he lost the career-service status that he had as a Dietitian IV, a union position (at least after the 2017 settlement). *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 33 (Dckt. No. 45). Washington was placed on probation for a year upon assuming his new role, meaning that he was "subject to at will employment without seniority and lay-off bumping rights." *See* Washington Aff., at ¶ 13 (Dckt. No. 43-3).

So, there is some evidence that Washington's new position as Administrative Analyst III, at least for the year of probation, was not a position equivalent in seniority, status, and pay (or not the nearest approximation to that position).

That's enough to create a genuine issue of fact about whether Washington's new position as Administrative Analyst III was equivalent in seniority, status, and pay (or the nearest approximation to an equivalent position). That fact is material, because it was Cook County's responsibility to employ Washington in a position "equivalent in seniority, status and pay, the duties of which [Washington was] qualified to perform or would become qualified to perform

with reasonable efforts," or "a position which is the nearest approximation to [that] position." *See* 38 U.S.C. § 4313(a)(3).

The failure-to-accommodate claim under USERRA (Count X) survives.

## II.    The Right Against Discrimination

The other right protected by USERRA is a right against discrimination on the basis of military service. *See* 38 U.S.C. § 4311. In the anti-discriminatory sense, USERRA is "very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011).

USERRA prohibits two forms of discrimination on the basis of military service.

First, USERRA prohibits employment discrimination *qua* employment discrimination. The statute provides that a returning veteran "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of [military] membership, . . . performance of service, . . . or obligation." *See* 38 U.S.C. § 4311(a).

Second, USERRA prohibits retaliation. It provides that "[a]n employer may not . . . take any adverse employment action against any person because such person . . . has taken an action to enforce a protection afforded any person under [USERRA] . . . [or] has exercised a right provided for in [USERRA]." *Id.* at § 4311(b).

As under Title VII, a person's exercise of this USERRA right does not need to be the but-for cause of the adverse employment action to state a claim of retaliation. It is enough if the exercise of the right is a motivating factor. A plaintiff has a USERRA claim "if the person's . . .

action to enforce a protection afforded any person under this chapter . . . [or] exercise of a right provided for in this chapter[] is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action . . . or exercise of a right." *Id.* at § 4311(c)(2) (emphasis added).

Turning to state law, ISERRA again provides an identical right against discrimination by borrowing the corresponding section of USERRA. *See* 330 ILCS 61/5-15 ("Section 4311 of the federal Uniformed Services Employment and Reemployment Rights Act . . . and the regulations promulgated under that Act are incorporated.").

## A.  Retaliation Claims (Counts XI and XII)

In Count XI, Washington asserts a retaliation claim that Cook County created a hostile work environment after Washington tried to enforce his rights under USERRA. *See* Cplt., at ¶¶ 155–62 (Dckt. No. 1). He also brings an identical claim in Count XII, but under ISERRA. *Id.* at ¶¶ 163–68.

Courts use a burden-shifting framework to evaluate USERRA discrimination claims (including retaliation claims) at summary judgment. "Under the burden-shifting framework of § 4311, a plaintiff makes out a prima facie case of discrimination by showing that his service membership was a motivating factor in the employer's [adverse] action." *See Crews v. City of Mt. Vernon*, 567 F.3d 860, 869 (7th Cir. 2009) (internal quotation marks omitted). "The employer must then prove that the action would have been taken in the absence of such membership." *Id.* (internal quotation marks omitted).

So here, Washington initially has the burden to show that his exercise of his USERRA rights was a motivating factor in the adverse employment action. If Washington can meet that

burden, then Cook County must show that it would have taken the adverse employment action even if Washington had not exercised his USERRA rights.

Washington never gets past the first step. He failed to present sufficient evidence that he suffered an adverse employment action.

The Seventh Circuit has held that a retaliation claim under USERRA requires a materially adverse employment action. *See Crews*, 567 F.3d at 869; *see also Lara v. Rock Valley Coll. Police Dep't*, 2023 WL 2374979, at *4 (N.D. Ill. 2023). And the Seventh Circuit has adopted the meaning of "adverse employment action" from other civil rights statutes into the USERRA context. *Crews*, 567 F.3d at 868–69.

"An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). It must be an action that "significantly alters the terms and conditions of the employee's job." *Id.* "Materially adverse actions include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities, but do not include 'everything that makes an employee unhappy.'" *Crews*, 567 F.3d at 869 (citing *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008)).

As a preliminary matter, the pre-disciplinary hearing on October 4, 2022 was not an adverse employment action. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 42). Weber, the hearing officer, did not have the authority to discipline Washington at the meeting. *See* Weber Aff., at ¶ 9 (Dckt. No. 39-14).

Weber did recommend a written warning. *Id.* But Washington never received any written warning, and, in fact, never heard any results of the hearing. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 29 (Dckt. No. 45); Pl. Dep. Tr. Day 1, at 148:8-17 (Dckt. No. 39-4).

36

And either way, the mere recommendation of a written warning does not amount to a materially adverse action. *See, e.g.*, *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse.").

At the end of the day, Washington has never been suspended without pay, terminated, or otherwise received a written reprimand or counseling. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 53 (Dckt. No. 42). Likewise, there is no record of any discipline in Washington's personnel file. *See* Groves Aff., at ¶¶ 3–4 (Dckt. No. 39-15).

So, Washington hangs his hat on the existence of a hostile work environment. Creating a hostile work environment can be an adverse employment action for the purposes of federal antidiscrimination statutes.[3] *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).

A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult." *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). To determine whether harassment rises to the actionable level, courts look at the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005).

Washington has not shown harassment that comes close to being actionable as a hostile work environment. And to the extent that the evidence supports any finding of harassment, there

---

[3] The existence of a hostile work environment can be the "adverse employment action" that acts as the basis for a retaliation claim under federal antidiscrimination statutes. A hostile work environment might also be an independently actionable claim under USERRA. *See, e.g.*, *Helms v. Village of Clarendon Hills*, 2019 WL 2409596, at *5 (N.D. Ill. 2019) (evaluating a hostile-work-environment claim under USERRA); *McDaniel v. Loyola Univ. Med. Ctr.*, 2014 WL 4269126, at *7 (N.D. Ill. 2014) (same). In any event, it doesn't matter whether Washington intends the alleged hostile work environment to be the basis of a retaliation claim or an independent claim, because Washington does not show that he was subjected to a hostile work environment.

is no evidence that the harassment was based on his military service or the exercise of his rights under USERRA.

Washington points to three examples of harassment in his complaint. They involved punching in and out, vacation, and the need to write a memo.

First, Cook County required him to punch in and out even though Cook County did not require other managerial employees to do so. Second, Cook County deducted vacation time that he had accrued without telling him why. Third, Cook County required him to write a memo in 2013 explaining why he had been redeployed and "otherwise made it difficult" for him to receive the necessary documentation to serve in the military. *See* Cplt., at ¶ 157 (Dckt. No. 1).

The Court will address each in turn.

On the first point, the record does show that Washington was required to clock in and clock out. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 42). But that requirement began in 2012, which was before Washington's first suit invoking his rights under USERRA (which was in 2013). *See* Def.'s Ex. 5, at 3 (Dckt. No. 39-8); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 12, 15. So, that requirement could not have been retaliatory harassment for bringing the suit.

In any event, the requirement to clock in and clock out is also not "physically threatening or humiliating," nor does it "unreasonably interfere with an employee's work performance." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806–07 (7th Cir. 2000). Thus, even if Cook County did intend to retaliate against him, applying a requirement to clock in and clock out would not contribute to an actionable hostile work environment.

Washington fares even worse on the second and third points, because they find no support in the evidentiary record.

There is no evidence that Cook County deducted Washington's vacation time without telling him why. The Court sees no reference to vacation time in either party's statement of facts. *See generally* Pl.'s Resp. to Def.'s Statement of Facts (Dckt. No. 42); Def's Resp. to Pl.'s Statement of Facts (Dckt. No. 45). And neither party provides any other citation to the record to support that assertion. So, Washington has not shown that he was harassed in this way, or that it was because of his military service.

Likewise, there is no evidence that Cook County made Washington write a memo explaining his redeployment in 2013 or that Cook County otherwise made it difficult for Washington to serve in the military. There is no reference to such an incident in either party's statement of facts. *See generally* Pl.'s Resp. to Def.'s Statement of Facts (Dckt. No. 42); Def's Resp. to Pl.'s Statement of Facts (Dckt. No. 45). And there is otherwise no record of such an incident in Washington's personnel record. *See* Groves Aff., at ¶¶ 3–4 (Dckt. No. 39-15).

On the contrary, the evidence shows that Washington submitted at least eight military orders for military leave over the course of his employment with Cook County, and all of them were approved. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 42). And, in any event, an employer requiring paperwork before military leave does not come close to creating a hostile work environment. *See, e.g.*, *McDaniel*, 2014 WL 4269126, at *7 ("[N]or are demands for paperwork or refusals to cover shifts severe, humiliating, or in any way physically threatening.").

In sum, the facts do not support the allegations in Washington's complaint. And to the extent that the factual record does support his allegations, the incidents do not come close to the level of a hostile work environment.

So, Washington takes a different tack in his summary-judgment briefing. Washington argues in his brief that he was "forced to request a transfer, . . . was forced to apply for and interview for another position, and was transferred to a non-equivalent position." *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 14 (Dckt. No. 41). But there is no admissible evidence in the record supporting the notion that Cook County forced Washington to transfer or forced him to apply for another position.

On the contrary, it was Washington who first asked for a job transfer at the bottom of his email from July 5. *See* Pl.'s Ex. 4, at 25 (Dckt. No. 43-5) ("At this point, . . . a job transfer should be considered as the only fair course of action."). At that point, Cook County was still actively trying to accommodate Washington in his then-current position as Dietician IV. Indeed, when EHS sent his supervisor his restrictions on July 6, she responded that same day that those restrictions could be accommodated. *See* Pl.'s Ex. 4, at 27 (Dckt. No. 43-5). And she emailed Washington later that day, explaining his new accommodations. *Id.* at 29.

Likewise, Washington was the one who decided to apply for a new position on September 4. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 42). Again, Cook County was still trying to accommodate Washington when he submitted his application. Washington's application came shortly after the two meetings of interactive process in August, where Cook County was trying to figure out possible accommodations for Washington. *Id.* at ¶ 46.

True, Washington's July 5 email makes it sound like he thought his supervisor was unhappy with him. His email opines about "door slamming and eye rolling" from his supervisor. *See* Pl.'s Ex. 4, at 24–25 (Dckt. No. 43-5). His email also says that other workers told him that

40

his supervisor had said statements like "Justin is the cause of all the chaos in the department" or "Justin does not do anything." *Id.*

Unfortunately for Washington, those statements run into the same hearsay problem. They are inadmissible if offered to prove the truth of the matter asserted. That is, they are inadmissible to show that the things stated in the email happened, or that his supervisor made those statements. *See* Fed. R. Evid. 801(c). So, there is no admissible evidence that Washington's supervisor did those things.

But even if there were admissible evidence of those incidents, Washington runs into three other problems.

First, those circumstances would not rise to the level of a hostile work environment. *See Swyear v. Fare Food Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (same).

Second, even if the circumstances did amount to a hostile work environment, it wouldn't be a hostile work environment created by Cook County – Washington's supervisor worked for Morrison Healthcare, not Cook County. *See* Pl. Dep. Tr. Day 2, at 18:6 – 19:5 (Dckt. No. 39-5).

And third, even if Cook County did create a hostile work environment, there is no evidence that the "harassment" by his supervisor was based on Washington's military service. *See Helms*, 2019 WL 2409596, at *5. Indeed, the allegedly "harassing" behavior and statements Washington mentions in his email do not reference his military service at all.

No matter how the Court slices it, Washington has not shown that Cook County forced him to transfer or apply for a new job. Cook County did not directly engage in an adverse

41

employment action by forcefully transferring him, nor did Cook County create a hostile work environment that forced him to transfer.

So, the bottom line is that Washington has not shown an adverse employment action taken by Cook County, nor has he shown that Cook County subjected him to a hostile work environment. As such, Washington's retaliation claims under USERRA and ISERRA fail. The Court grants judgment on Counts XI and XII in favor of Cook County.

## Conclusion

For the foregoing reasons, Cook County's motion for summary judgment is granted in part and denied in part. The Court grants summary judgment for Cook County on Counts VI, VII, VIII, XI, and XII. Count X (the failure-to-accommodate claim under USERRA) survives.

Date: March 31, 2025

_____
Steven C. Seeger
United States District Judge